70 F.3d 610
 315 U.S.App.D.C. 49
 Shereen ARENT, The Center for Science in the Public
Interest, and Public Citizen, Inc., Appellants,
v.
Donna E. SHALALA, Secretary of the United States Department
of Health and Human Services, Appellee.
 No. 94-5271.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 27, 1995.
Decided Nov. 14, 1995.
 
 Appeal from the United States District Court for the District of Columbia (No. 92cv00148).
 Allison M. Zieve argued the cause, for appellants, with whom Brian Wolfman and Alan B. Morrison, Washington, DC, were on the briefs.
 Drake S. Cutini, Attorney, United States Department of Justice, argued the cause, for appellee, with whom Frank W. Hunger, Assistant Attorney General, and Deborah S. Smolover, Attorney, United States Department of Justice, were on the brief. Eric H. Holder, Jr., United States Attorney, and Douglas N. Letter, Litigation Counsel, United States Department of Justice, entered appearances, for appellee.
 Before: EDWARDS, Chief Judge, WALD and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Chief Judge EDWARDS.
 Concurring opinion filed by Circuit Judge WALD.
 HARRY T. EDWARDS, Chief Judge:
 
 
 1
 Appellants Shereen Arent, the Center for Science in the Public Interest, and Public Citizen, Inc. brought suit in the District Court to challenge final regulations concerning nutritional labeling of raw produce and fish promulgated by the Food and Drug Administration ("FDA") pursuant to the Nutrition Labeling and Education Act of 1990, 21 U.S.C. Secs. 321, 337, 343, 343-1, 345, 371 (1994) ("NLEA" or "Act"). The Act establishes voluntary guidelines under which retail food stores provide to consumers nutritional information regarding raw produce and fish. If the FDA finds that food retail stores overall are not in "substantial compliance" with the guidelines, the NLEA requires the FDA to issue mandatory food labeling regulations. 21 U.S.C. Sec. 343(q)(4)(D)(i) (1994). Appellants assert that the FDA regulations defining "substantial compliance" set a standard so low as to be arbitrary and capricious and in violation of the NLEA.
 
 
 2
 The District Court granted appellee's[1] motion to dismiss, finding that the determinations embodied in the FDA's regulations, although not immune from judicial review under the Administrative Procedure Act ("APA"), represent reasonable and permissible constructions of the NLEA. Arent v. Shalala, 866 F.Supp. 6 (D.D.C.1994). We agree that Congress provided judicially manageable standards for reviewing the FDA's determination of "substantial compliance" under the NLEA, and that the FDA's determination warrants no presumption of unreviewability. Further, we uphold the FDA's regulations defining "substantial compliance" because the record discloses that the FDA was guided by the proper statutory factors, provided a reasoned explanation demonstrating reliance upon those factors, and reached a determination in keeping with the statutory intent. We remand to the District Court, however, for consideration of the parties' discovery motions relating to the FDA's 1993 finding that food retailers overall were in fact in substantial compliance with the NLEA's voluntary guidelines.
 
 I. BACKGROUND
 A. Statutory Background
 
 3
 The NLEA was enacted, inter alia, to clarify and strengthen the FDA's legal authority to require nutrition labeling on food. H.R.REP. No. 538, 101st Cong., 2d Sess. 7 (1990), U.S.Code Cong. & Admin.News 1990, pp. 3336, 3337. The Act requires that food manufacturers provide nutritional labels that contain specified information for most foods sold in retail food stores. The NLEA also requires that the FDA promulgate voluntary guidelines pursuant to which retail food stores provide nutrition information for certain of the most frequently purchased varieties of raw fish and produce. 21 U.S.C. Sec. 343(q)(4)(B)(i) (1994). The nutrition labeling guidelines for raw produce and fish are to remain voluntary unless the FDA finds that food retailers are not in "substantial compliance" with the guidelines. Id. Sec. 343(q)(4)(D). The NLEA requires that the Secretary of Health and Human Services issue a regulation defining the circumstances that constitute food retailers' "substantial compliance" with the voluntary labeling guidelines. Id. Sec. 343(q)(4)(B)(ii). In that regard, the Act provides the FDA with the following guidance:
 
 
 4
 The regulation shall provide that there is not substantial compliance if a significant number of retailers have failed to comply with the guidelines. The size of the retailers and the portion of the market served by retailers in compliance with the guidelines shall be considered in determining whether the substantial-compliance standard has been met.
 
 
 5
 Id. In addition, under the Act, the FDA was given until May 1993 to analyze and publish the results of a survey of grocery stores determining whether there was substantial compliance with the voluntary guidelines. Id. Sec. 343(q)(4)(C)(i).
 
 
 6
 The Secretary issued regulations stating that the FDA would find industry-wide substantial compliance with the voluntary guidelines if "at least 60 percent of all stores that are evaluated are in compliance." 21 C.F.R. Sec. 101.43(c) (1995). In addition, the FDA determined that, for the purpose of conducting its survey, a retailer would be deemed in compliance with the voluntary guidelines if the retailer provided nutritional information for "at least 90 percent" of the relevant produce and "at least 90 percent" of the relevant fish. Id. Sec. 101.43(a). The methodology of the FDA's first survey included four demographic factors: store sales volume (stores were divided into two categories based on average annual sales); store type (i.e., independently operated stores vs. chains); geographic location (all states and the District of Columbia were included in the survey); and county size (counties were divided into four size categories to ensure that retailers from both urbanized and rural areas were represented in the survey sample). In all, roughly 2,000 food retailers were surveyed, and the FDA determined that the food retail industry as a whole was in substantial compliance with the voluntary food labeling guidelines because 75.7% of the retailers surveyed had complied with the guidelines for raw produce, and 73.2% had complied for raw fish. CENTER FOR FOOD SAFETY AND APPLIED NUTRITION, FDA, REPORT ON VOLUNTARY COMPLIANCE BY FOOD RETAILERS IN PROVIDING NUTRITION LABELING INFORMATION FOR RAW FRUIT AND VEGETABLES AND FOR RAW FISH 4, 8 (1993) ("Report"), reprinted in Joint Appendix ("J.A.") 101, 105.
 
 B. The Proceedings in District Court
 
 7
 The FDA issued the 1993 Report of its survey findings during the pendency of the parties' cross-motions for dismissal and summary judgment. Appellants' initial complaint challenged only the definition of "substantial compliance" contained in the FDA's regulations; but, in view of the Report, appellants moved to amend their complaint to add an allegation challenging the Report's finding that food retailers were in fact in substantial compliance with the voluntary NLEA guidelines.[2] Concerned about the validity and accuracy of the Report's findings, appellants also sought discovery on specific information about the survey results and methodology. Appellants then requested that the trial court not rule on the pending motions for dismissal and summary judgment until the completion of discovery and the filing of supplemental briefs. Appellants argued that the parties had only briefed the issue of the FDA's definition of "substantial compliance," and that, even if the District Court upheld the FDA's sixty-percent definition, discovery would still be necessary to determine whether retailer compliance was in fact lower than sixty percent.[3] In response, the Secretary opposed appellants' motion to amend their complaint, and moved for a protective order or, in the alternative, a stay of discovery on the ground that the pending dispositive motions rendered the discovery premature.
 
 
 8
 In its memorandum decision, the District Court determined that appellants have standing to challenge the FDA's regulations and found that the agency action at issue is subject to judicial review. On the merits, the trial court characterized its task as "review[ing] an agency's construction of a statute" and applied the analytical framework of Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Arent, 866 F.Supp. at 13. Finding that Congress did not address specifically the level of compliance necessary to establish "substantial compliance," the court moved on to the second prong of the Chevron analysis and found that the challenged regulations embody a permissible construction of the NLEA. Given the demographics of the retail food industry, in which large chain stores are relatively few in number but serve a majority of shoppers, the District Court held that the FDA's regulation regarding industry-wide compliance "struck a reasonable balance among extreme scenarios that could develop from the statutory scheme." Id. at 15. The court also upheld the FDA's individual-compliance regulation, accepting as plausible the Secretary's explanation that a ninety-percent individual-compliance standard was appropriate to account for minor instances of noncompliance caused by placards falling down or pages falling out of books or binders. On these grounds, the District Court granted the Secretary's motion to dismiss and declared moot the parties' discovery-related motions.
 
 II. ANALYSIS
 A. Availability of Judicial Review
 
 9
 As an initial matter, we reject the FDA's contention that there is no law to apply in reviewing its definition of food retailers' "substantial compliance" with the NLEA's voluntary guidelines. The APA embodies a general presumption of reviewability, see Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1510, 18 L.Ed.2d 681 (1967), and the exception established by 5 U.S.C. Sec. 701(a)(2) (1988) for agency action that is "committed to agency discretion by law" is "a very narrow exception" reserved for "those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (internal quotations omitted). In the NLEA, Congress provided meaningful standards against which to judge the FDA's exercise of discretion in requiring that the FDA's definition of "substantial compliance" exclude the situation where a "significant number of retailers" fail to comply with the voluntary guidelines, and requiring that the FDA consider the size and market share of the retailers complying with the guidelines in determining whether the substantial-compliance standard has been met. 21 U.S.C. Sec. 343(q)(4)(B)(ii) (1994). Congress clearly intended to restrict the FDA to a storewide, retailer-based, numerical standard of "substantial compliance," and Congress further specified that the evaluation of overall retailer compliance was to take account of market penetration, rather than focus purely on the gross numbers of retailers in compliance. These statutory commands are no less definite than the provisions at issue in many cases in which this court has found judicially manageable standards against which to evaluate whether an agency action constituted an abuse of discretion. See, e.g., Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221, 1223-25 (D.C.Cir.1993) (A statute directing the Secretary of Health and Human Services to provide "exceptions" to the prospective amounts of Medicare payments to hospitals "as the Secretary deems appropriate" did not commit to agency discretion by law the decision whether to provide exceptions.); National Treasury Employees Union v. Horner, 854 F.2d 490, 495 (D.C.Cir.1988) (A statutory scheme allowing the Office of Personnel Management to depart from competitive civil service only when "necessary" for "conditions of good administration" provided manageable standards for reviewing agency action.). As it often does, in enacting the NLEA, Congress provided "a meaningful--not a rigorous, but neither a meaningless--standard against which to judge" the exercise of agency discretion. Id.
 
 
 10
 We also reject the Secretary's suggestion that the FDA's determination of substantial compliance warrants a presumption of unreviewability under the rationale of Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), where the Supreme Court ruled that agency refusals to take "enforcement action" should be afforded a presumption of unreviewability under section 701(a)(2). Chaney, 470 U.S. at 831, 105 S.Ct. at 1655. Chaney is of no assistance to the FDA in this case because the FDA's promulgation of a standard for "substantial compliance" under the NLEA does not represent an enforcement action.
 
 
 11
 In light of our conclusion that this court has jurisdiction to review the FDA's determination regarding the standards for measuring retailer compliance with the NLEA's voluntary food labeling guidelines, we turn to the merits of appellants' challenges to the FDA's industry-wide and individual compliance standards.
 
 
 12
 B. The Industry-Wide "Substantial Compliance" Standard
 
 
 13
 Although the parties argue this case in terms of both Chevron analysis and arbitrary and capricious review, they interpret the case as one involving review of an agency's construction of a statute and look primarily to Chevron for the appropriate analytical framework. We, however, do not find Chevron controlling. In challenging the FDA's regulation defining "substantial compliance," appellants seek traditional arbitrary and capricious review governed by Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).[4] We recognize that, in some respects, Chevron review and arbitrary and capricious review overlap at the margins. See note 6 infra. But it would be a mistake to view this case as one involving typical Chevron review.
 
 
 14
 Chevron is principally concerned with whether an agency has authority to act under a statute. See Chevron, 467 U.S. at 842-45, 104 S.Ct. at 2781-83. Thus, a reviewing court's inquiry under Chevron is rooted in statutory analysis and is focused on discerning the boundaries of Congress' delegation of authority to the agency; and as long as the agency stays within that delegation, it is free to make policy choices in interpreting the statute, and such interpretations are entitled to deference. Id. at 843-45, 865-66, 104 S.Ct. at 2781-83, 2792-93. The paradigmatic Chevron case concerns " '[t]he power of an administrative agency to administer a congressionally created ... program.' " Id. at 843, 104 S.Ct. at 2781 (quoting Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974)) (emphasis added); see, e.g., Railway Labor Executives' Ass'n v. National Mediation Bd., 29 F.3d 655, 670-71 (D.C.Cir.1994) (as amended July 20, 1994) (en banc ) (The issue before the court was not whether the agency's regulations were reasonable--which is a hallmark of traditional arbitrary and capricious review--but rather, whether the agency had any authority to promulgate regulations in the area in which it sought to act.), cert. denied, --- U.S. ----, 115 S.Ct. 1392, 131 L.Ed.2d 243 (1995). In such a case, the question for the reviewing court is whether the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the agency's interpretation "is based on a permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. at 2781.
 
 
 15
 In the present case, however, there is no question that the FDA had authority to define the circumstances constituting food retailers' substantial compliance with the NLEA's voluntary labeling guidelines. The only issue here is whether the FDA's discharge of that authority was reasonable. Such a question falls within the province of traditional arbitrary and capricious review under 5 U.S.C. Sec. 706(2)(A) (1988).[5] See Chevron, 467 U.S. at 843-44, 104 S.Ct. at 2781-82 (The Court notes that where there has been "an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," and the delegation of authority has been exercised, the agency's "regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.").[6] Thus, in the present case, State Farm is controlling regarding the standard of review.
 
 In State Farm, the Court held:
 
 16
 The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given.
 
 
 17
 State Farm, 463 U.S. at 43, 103 S.Ct. at 2866 (citations and internal quotations omitted). Under this standard of review, it is clear that the FDA's regulations must be upheld.
 
 
 18
 The FDA certainly took account of the relevant factors in devising its sixty-percent, industry-wide standard for food retailers' "substantial compliance" under the NLEA. In the context of the NLEA, Congress intended that the determination of "substantial compliance" would be informed by the number, size, and market share of the food retailers in compliance with the voluntary guidelines. 21 U.S.C. Sec. 343(q)(4)(B)(ii) (1994). The FDA specifically considered these factors in its rulemaking. 56 Fed.Reg. 30468, 30477 (1991) (to be codified at 21 C.F.R. pt. 101) (proposed July 2, 1991). Moreover, as the District Court observed, "[b]y focusing attention on market share, Congress implied that the success of this legislation would be judged by how many people received nutrition information not strictly by how many stores posted the information." Arent, 866 F.Supp. at 14. In furtherance of the statutory intent to focus on market penetration in assessing compliance with the voluntary guidelines, the FDA identified and considered additional relevant factors, such as the categories of retail stores to include in its survey evaluation--such as chains, independents, or stores with high volume sales--and the correlation between the distribution of grocery sales among categories of stores and the distribution of the population served by those categories of stores. 56 Fed.Reg. at 30477.
 
 
 19
 The FDA also has articulated an explanation for its decision that demonstrates its reliance on a variety of relevant factors and represents a reasonable accommodation in light of the facts before the agency. The FDA observed that chain and independent grocery stores with annual sales of two million dollars or more represent only 18% of all U.S. food stores but account for 81.5% of total U.S. grocery sales, while independents with annual sales of $300,000 or less represent 42.6% of all food stores but only 2.7% of all grocery sales. Id. at 30477, 30481. The FDA also observed that the distribution of grocery sales among categories of stores closely approximates the distribution of the population served by those categories of stores. Id. at 30477. In view of these observations and the breakdown of retail stores included in its 2,000-store survey, the FDA determined that setting a sixty-percent cutoff value for "substantial compliance" would ensure that
 
 
 20
 substantial compliance will not be achieved unless there is significant participation by the chains. Thus, substantial compliance based on the 60 percent standard will mean that a significant number of large retailers that serve a large part of the retail food market will be in compliance with the guidelines.
 
 
 21
 Id. at 30478. Thus, the FDA reasonably concluded that its numerical standard would ensure that, "while not all covered retailers are providing nutrition labeling, the most significant segment of the food retailing industry is." Id.
 
 
 22
 Given the record before the agency, the FDA's sixty-percent figure is not unreasonable and it certainly does not reveal "a clear error of judgment." Overton Park, 401 U.S. at 416, 91 S.Ct. at 823. Moreover, the statutory intent was not to assure one-hundred-percent compliance, but rather "substantial" compliance, and the FDA's sixty-percent standard does ensure that a major portion of the retail food market will receive nutritional information. Thus, we find no basis for setting aside the FDA's sixty-percent standard for "substantial compliance" under the NLEA.
 
 C. The Individual-Compliance Standard
 
 23
 We also find that the FDA reasonably accommodated the possibility of minor, inadvertent instances of noncompliance with the NLEA's voluntary guidelines when the agency established a ninety-percent standard for individual retailer compliance for purposes of the survey required by the NLEA. The FDA certainly should be allowed leeway to establish a de minimis rule in the regulations detailing its survey methodology. See, e.g., Ohio v. EPA, 997 F.2d 1520, 1534-35 (D.C.Cir.1993) (per curiam) (The court upheld an EPA regulation that imposed a de minimis gloss on a statutory provision that required the agency to conduct periodic reviews of remedial actions taken in response to hazardous waste threats.). Thus, the issue becomes whether a ten-percent cushion is a fair proxy for a de minimis standard. Although we recognize that the proper scope of de minimis tolerance will vary from context to context, appellants provide no significant challenge to the notion that ten-percent latitude is comparable to a de minimis standard in the context of the FDA's survey. Moreover, a ten-percent standard has the advantage of providing clear guidance to surveyors, whereas a regulation that simply stated a de minimis rule would allow surveyors to fluctuate in their leniency from store to store, perhaps providing more than ten-percent leeway in some instances.
 
 D. Pending Discovery Motions
 
 24
 Although we affirm the District Court's rulings on the merits, we reverse its determination that the parties' pending discovery motions are mooted by the merits resolution. The District Court granted appellants' motion to amend their complaint to include an allegation that "the finding of substantial compliance in the FDA's Report contravene[s] the NLEA and should, therefore, be declared invalid." Pls.' First Supplemental and Am.Compl. p 2, reprinted in J.A. 32. The amendment to the complaint does not specifically set forth the basis for appellants' dispute with the Report's substantial-compliance finding. The amendment could be read as merely alleging that the survey results, although accurate, do not establish "substantial compliance" within the meaning of the NLEA because the NLEA requires something greater than the roughly three-fourths compliance indicated by the survey results. If the amendment is read in this way, the discovery motions are indeed moot because appellants have no claim that would survive our decision to uphold the FDA's sixty-percent standard for substantial compliance. However, as appellants argue on appeal, the amendment may represent an assertion that the FDA's survey methodology was flawed, and that the survey results therefore are inaccurate and do not support a finding of substantial compliance even under the FDA's sixty-percent standard. Under this latter interpretation, further discovery may be appropriate to allow appellants to pursue their claim that the Report's finding of substantial compliance is invalid.
 
 
 25
 Although the amended complaint is ambiguous on its face, and the record is not entirely consistent in demonstrating whether appellants intended for their amendment to challenge the accuracy of the Report's findings, under the notice pleading regime of the Federal Rules of Civil Procedure, a lack of specificity is not fatal so long as the defendant is given "fair notice" of the plaintiff's claim. Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); see also FED.R.CIV.P. 8(a)(2) (Pleadings must contain "a short and plain statement of the claim" for relief.). The record establishes that the FDA had ample notice of appellants' concerns about the validity of the survey,[7] and of appellants' position that their concerns cast doubt on whether a finding of "substantial compliance" was warranted even under the FDA's own definition of the term.[8] Moreover, there is evidence that the FDA itself interpreted appellants' amended complaint as a challenge to the survey's accuracy and an allegation that the true level of retailer compliance may not have satisfied the FDA's sixty-percent standard.[9] The record satisfies us that the FDA had fair notice of the interpretation of appellants' amended complaint for which appellants now argue on appeal. Thus, appellants' challenge to the FDA Report's specific finding of substantial compliance survives our rulings regarding the FDA's definition of the "substantial compliance" standard.
 
 III. CONCLUSION
 
 26
 For the reasons set forth above, we find that the FDA regulations defining "substantial compliance" under the NLEA are not arbitrary and capricious. Nevertheless, we remand to the District Court for consideration of the parties' pending discovery motions.
 
 
 27
 So ordered.
 
 
 28
 WALD, Circuit Judge, concurring in the judgment:
 
 
 29
 While I agree with the panel's conclusion that the Food and Drug Administration's ("FDA") rule is justifiable, I would resolve the case under the Chevron step two challenge which was presented by the parties and addressed by the trial court, rather than grounding our decision on a different facet of Administrative Procedure Act ("APA") review.
 
 
 30
 To begin with, I do not believe that the Chevron challenge was "mistake[n]," Majority opinion ("Maj. op.") at 615, and deserves to be ignored. The panel opinion says that because the statute explicitly authorizes the agency to promulgate regulations defining substantial compliance, "[t]he only issue here is whether the FDA's discharge of that authority was reasonable." Maj. op. at 616. The majority then maintains that the reasonableness inquiry "falls within the province of traditional arbitrary and capricious review," thereby rendering Chevron inapplicable. Id. I do not think that reasoning holds true in all cases, and specifically not in this case.
 
 
 31
 Chevron allocates power to interpret statutes among the branches of government by creating a presumption that agencies, rather than the courts, are the preferred institution for filling in statutory gaps.[1] Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The first step of Chevron is straightforward; if the statutory language is clear, it controls. The second step, where in my view the majority goes astray, entrusts agencies with authority to interpret statutory ambiguities, provided they do so in a manner that is reasonable and consistent with the language and purposes of the statute. See, e.g., Rettig v. Pension Benefit Guar. Corp., 744 F.2d 133, 151 (D.C.Cir.1984). By contrast, garden-variety APA review under Sec. 706 focuses more heavily on the agency's decisionmaking process; to survive arbitrary and capricious review, "the agency must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (explaining scope of review under 5 U.S.C. Sec. 706(2)(A)) (citation and internal quotation omitted).
 
 
 32
 Given these differences in the central concerns behind the two analytic frameworks, there are certainly situations where a challenge to an agency's regulation will fall squarely within one rubric, rather than the other. See Continental Air Lines v. Dep't of Transp., 843 F.2d 1444, 1452 (D.C.Cir.1988) (discussing differences between arbitrary/capricious review and review of agency interpretation of statutory ambiguity). For example, we might invalidate an agency's decision under Chevron as inconsistent with its statutory mandate, even though we do not believe the decision reflects an arbitrary policy choice. Such a result might occur when we believe the agency's course of action to be the most appropriate and effective means of achieving a goal, but determine that Congress has selected a different--albeit, in our eyes, less propitious--path. Conversely, we might determine that although not barred by statute, an agency's action is arbitrary and capricious because the agency has not considered certain relevant factors or articulated any rationale for its choice.[2] Or, along similar lines, we might find a regulation arbitrary and capricious, while deciding that Chevron is inapplicable because Congress' delegation to the agency is so broad as to be virtually unreviewable.[3]
 
 
 33
 But I agree with the panel that despite these distinctions, the Chevron and State Farm frameworks often do overlap. Compare Chevron, 467 U.S. at 844, 104 S.Ct. at 2782 (where congressional delegation is express, court must defer to agency's regulations "unless they are arbitrary, capricious, or manifestly contrary to the statute") with APA, 5 U.S.C. Sec. 706(2)(A) (1988) (reviewing court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). Because both standards require the reviewing court to ask whether the agency has considered all of the factors made relevant by the statute, this court has often found the State Farm line of cases relevant to a Chevron step two analysis. See, e.g., American Fed. of Labor & Cong. of Indus. Org. v. Brock, 835 F.2d 912, 917 (D.C.Cir.1987).
 
 
 34
 The case before us arguably falls within this area of overlap. In reviewing the FDA's regulations, our task was to determine whether the agency rationally considered the factors set forth in the NLEA when it defined "substantial compliance." Accordingly, I would not argue that State Farm is altogether irrelevant to our analysis, but given the scope and function of Chevron step two analysis, neither would I find State Farm applicable to the exclusion of Chevron, as the majority does. Petitioners' appeal ultimately does stand or fall on whether the FDA heeded Congress' admonitions that it may not find "substantial compliance" if "a significant number of retailers" have failed to comply, and that it must consider "[t]he size of the retailers and the portion of the market served by retailers in compliance with the guidelines" when making this determination. 21 U.S.C. Sec. 343(q)(4)(B)(ii) (1988). This language is sufficiently concrete to permit review of whether the agency's interpretation is reasonable and consistent with Congress' purpose in enacting the NLEA. In fact, I believe it well within the bounds of typical Chevron step two analysis, which is why the majority's opinion troubles me somewhat. If this case falls totally outside Chevron, many other cases marching under its banner must be similarly exiled. The majority's unequivocal rejection of the Chevron analytic framework utilized by the parties and the trial court in this case provides no clues as to the boundary lines for Chevron and APA review.
 
 
 35
 Finally, I worry that second-guessing the parties and counsel on the primary analytic mode for their challenges[4] causes unnecessary confusion and uncertainty among administrative law practitioners. I think a court should refrain from reframing or abandoning the issues raised by the parties unless their formulations are frivolous or misconceived. Otherwise we are posing the questions, and then answering them ourselves without help from counsel. Generally, courts ought to stick closely to the issues raised and the arguments made by counsel, and I would have done so here by resolving this case under the Chevron mode of analysis. Had I done so, I would have arrived at the same result as the majority on basically the same grounds as the district court, and for that reason, I concur in the judgment.
 
 
 
 [1]
 References to the Secretary of Health and Human Services ("Secretary") and the FDA will be used interchangeably to refer to the appellee in this action
 
 
 [2]
 Pls.' Mot. to Supplement and Amend Compl. pp 4b, 4c. The District Court ultimately granted appellants' motion to amend their complaint in the Order accompanying the court's memorandum decision resolving the case on the merits. Arent, 866 F.Supp. at 16
 
 
 [3]
 See Pls.' Req. That Ct. Forego Ruling on Pending Mots. Until Completion of Disc. and Filing of Supplemental Brs. at 2-4
 
 
 [4]
 We disagree with the suggestion made in the concurring opinion that the parties never raised the issue of State Farm arbitrary and capricious review, and that therefore we ought not address it. Although it is true that the majority of the argument in appellants' brief focuses on Chevron, which we find to be inapplicable, appellants assert in the heading of their principal argument to the court that "THE FDA'S DEFINITION OF SUBSTANTIAL COMPLIANCE IS ARBITRARY AND CAPRICIOUS AND IN VIOLATION OF THE NLEA." Brief for Appellants at 20; see also id. at 41, 103 S.Ct. at 2865 (Appellants argue that "the decision of the district court should be reversed on the ground that the FDA's substantial compliance regulations are arbitrary and capricious and in violation of the NLEA."). Likewise, the FDA asserts in one of its argument headings that "The FDA Regulations Defining the Circumstances Constituting Substantial Compliance ... Are Not Arbitrary, Capricious or Contrary to the NLEA," and the FDA characterizes the relevant inquiry as "whether an agency's action is 'arbitrary and capricious' and must be set aside under 5 U.S.C. Sec. 706(2)(A)." Brief for Appellee at 26
 Moreover, appellants alleged in their complaint that the FDA's regulation establishing a sixty-percent standard for substantial compliance "is arbitrary and capricious, and contravenes the NLEA," and that the FDA's regulation establishing a ninety-percent standard for individual retailer compliance "is arbitrary and capricious, and is unauthorized by the NLEA," arguing that both regulations should be declared invalid under 5 U.S.C. Sec. 706(2) of the APA. Pls.' First Supplemental and Am.Compl. pp 21, 23, reprinted in J.A. 38-39. And the District Court clearly interpreted appellants' arguments as implicating arbitrary and capricious review. Arent, 866 F.Supp. at 9 ("The Plaintiffs argue that [the FDA's regulation defining overall substantial compliance] is arbitrary and capricious and violates ... the NLEA. The Plaintiffs also claim that [the FDA's regulation defining individual retailer compliance] is arbitrary and capricious and violates ... the NLEA."). The District Court itself prefaced the section of its opinion resolving the merits of the parties' dispute with the heading, "Review of the Regulations Under the 'Arbitrary and Capricious' Standard of the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A)." Id. at 13. The District Court proceeded to quote at length from State Farm in laying out the applicable standard of review. Id. at 14.
 In view of these indications that the parties contemplated the application of arbitrary and capricious review in this case, we disagree that, by deciding this case under State Farm, we are in any way "second-guessing the parties" or "reframing" the issues so as to decide this case on grounds not raised or argued by the parties. Concurring op. at 620-621.
 
 
 [5]
 Section 706(2)(A) provides that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A) (1988). The Supreme Court elucidated the arbitrary and capricious standard of review in Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)
 
 
 [6]
 The Chevron analysis and the "arbitrary, capricious" inquiry set forth in State Farm overlap in some circumstances, because whether an agency action is "manifestly contrary to the statute" is important both under Chevron and under State Farm. See 5 U.S.C. Sec. 706(2)(A) (1988) (The APA directs a reviewing court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.") (emphasis added); see, e.g., National Ass'n of Regulatory Util. Comm'rs v. ICC, 41 F.3d 721, 728 (D.C.Cir.1994) ("The Commission has, in our view, acted unreasonably whether one considers the case as one involving a question of Chevron Step II statutory interpretation or a garden variety arbitrary and capricious review or, as we do, a case that overlaps both administrative law concepts.")
 In addition, the Supreme Court's decision in Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), further demonstrates that there are occasions when Chevron "step two" review and State Farm review overlap. In reviewing regulations of the Department of Health and Human Services that evidenced a change in the agency's position on the interpretation of a statute, the Court in Rust found that the terms of the statute and its legislative history militated in favor of judicial deference to the agency's interpretation of the statute under Chevron, and that the agency's changed position was supported by reasoned decisionmaking required by State Farm. 500 U.S. at 186-87, 111 S.Ct. at 1768-69. In such situations, what is "permissible" under Chevron is also reasonable under State Farm.
 
 
 [7]
 See Pls.' Req. That Ct. Forego Ruling on Pending Mots. Until Completion of Disc. and Filing of Supplemental Brs. at 4 (Appellants stated that they "have obtained informally from defendant limited material that gives them concern about the validity and accuracy of the Report."); id. at 3 ("[B]ecause defendant believes that the level of compliance reflected in the Report constitutes 'substantial compliance' ... plaintiffs have served [discovery requests] to determine whether the underlying data collected by the FDA in its survey of retail food stores are consistent with the Report's findings and were collected in an appropriate fashion."); Pls.' Reply Mem. in Supp. of Mot. to Supplement and Amend Compl. at 4 (Appellants state that they "are concerned that the survey was indeed faulty, and will file discovery in that regard."); Pls.' Opp'n to Def.'s Mot. for Protective Order at 2-3 ("The discovery [filed by appellants after reviewing the FDA's Report] is necessary principally because it appears that the Secretary's survey may have been flawed, and may have overstated the actual level of compliance by retailers.")
 
 
 [8]
 See Pls.' Req. That Ct. Forego Ruling on Pending Mots. Until Completion of Disc. and Filing of Supplemental Brs. at 4 ("[T]he discovery propounded by plaintiffs may well show that compliance was actually less than the Report indicates.... [I]f compliance was actually less than 60%, there will be no 'substantial compliance' with the guidelines, even as defendant defines that term, and defendant will be required to issue regulations mandating the provision of nutritional information for [raw] produce and fish.")
 
 
 [9]
 See Def.'s Opp'n to Pls.' Mot. to Amend Compl. at 5 n. 3 (The FDA acknowledged that appellants' amended complaint could be interpreted to include "an allegation that the Secretary's finding may rest on a faulty survey; i.e., the level of compliance may not be 60 percent."). Even when appellants appeared to argue that the amendment to their complaint did not address the validity of the survey, see Pls.' Reply Mem. in Supp. of Mot. to Supplement and Amend Compl. at 3-4, the FDA continued to assert that appellants did "attempt to raise in their amended complaint" the allegation that the Secretary's actual finding of substantial compliance is erroneous, and the FDA continued to interpret that allegation as it had in footnote 3 of its Opposition to Plaintiffs' Motion to Amend Complaint, where the FDA acknowledged that the allegation called into question whether the actual level of retailer compliance was below sixty percent. Secretary's Reply in Supp. of Mot. for Protective Order at 2
 
 
 [1]
 Although the majority contends that "Chevron is principally concerned with whether an agency has authority to act under a statute," Maj. op. at 615, I think Chevron requires a reviewing court to ask a somewhat different question: whether an agency's specific course of action is permitted by statute. It is possible that a statute might grant an agency authority to act in some fashion, but not in the particular manner it has chosen. Petitioners argue that the case before us presents just this problem. They do not question the FDA's authority to promulgate regulations defining substantial compliance, but argue that the specific compliance standard selected by the agency (60% of retailers satisfying a 90% individual compliance standard) was not permitted by the Nutrition Labeling and Education Act's ("NLEA") requirement that "a significant number of retailers" comply with the labeling guidelines
 
 
 [2]
 In several cases, this court has analyzed challenges based on Chevron and State Farm in separate and distinct inquiries. See, e.g., National Recycling Coalition, Inc. v. Browner, 984 F.2d 1243, 1250-52 (D.C.Cir.1993); Solite Corp. v. United States EPA, 952 F.2d 473, 482-88 (D.C.Cir.1991); City of Kansas City, Mo. v. HUD, 923 F.2d 188, 191-94 (D.C.Cir.1991)
 
 
 [3]
 This type of case is rare, though; this court has found that phrases as broad as "public interest" constrain agency authority enough to permit Chevron step two review. See, e.g., American Postal Workers Union v. United States Postal Serv., 891 F.2d 304, 313 (D.C.Cir.1989) ("In our view, Chevron reasonableness review of an agency's interpretation of a 'public interest' standard is not empty rhetoric; it is intended to have a limiting effect on the range of agency discretion."), rev'd on other grounds sub nom. Air Courier Conference v. American Postal Workers Union, 498 U.S. 517, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991)
 
 
 [4]
 The majority contends that it is appropriate to resolve this case under State Farm arbitrary and capricious review because the parties raised this issue in their briefs and in the proceedings below. Maj. op. at 615 n. 4. I am inclined to disagree with this characterization. Although the majority correctly asserts that the parties and the trial court occasionally used the words "arbitrary and capricious" and cited to State Farm, I read these references as made in the context of a Chevron step two analysis. See, e.g., Brief for Appellants at 20-39 (arguing that FDA regulation violates statutory directive, but contending that typical Chevron deference is unwarranted because FDA did not rely on agency expertise in promulgating regulation); Brief for Appellees at 23 (arguing that trial court's ruling should be upheld because "court below properly employed a 'Chevron II' analysis"), 26 (FDA regulations "are not arbitrary, capricious, or contrary to the NLEA"), 29 (60% compliance is "rational [and] consistent with the NLEA"), 39 (90% individual compliance standard is "rational [and] consistent with the NLEA"); Arent v. Shalala, 866 F.Supp. 6, 13-14 (D.D.C.1994) ("Chevron ... provides the analytical framework which the Court must use to review an agency's construction of a statute.... The Court ... will uphold [the regulations] unless those regulations are arbitrary, capricious or manifestly contrary to the NLEA."). Certainly at no point was the suggestion made by either party that this court abandon the Chevron framework for State Farm arbitrary and capricious review