**AMAX LAND COMPANY, Appellee,**

v.

**Cynthia QUARTERMAN, Director, Minerals Management Service, et al., Appellants.**

No. 98–5367.

United States Court of Appeals, District of Columbia Circuit.

Argued May 10, 1999.

Decided July 16, 1999.

Robert L. Klarquist, Attorney, United States Department of Justice, argued the cause for appellants. With him on the briefs were Lois J. Schiffer, Assistant Attorney General, and Andrew C. Mergen, Attorney.

Thomas R. Lundquist argued the cause and filed the brief for appellee.

Harold P. Quinn, Jr., L. Poe Leggette, and Glenn S. Benson were on the brief for amicus curiae National Mining Association.

Before: SILBERMAN, HENDERSON, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Amax Land Company, a lessee of federally owned coal-containing land, challenges the legality of a regulation adopted by the Minerals Management Service (MMS) and a payment order issued pursuant thereto. The regulation assesses interest on late coal lease payments at a higher rate than the government can earn on investments of its short term operating cash, and was interpreted by MMS in the payment order to allow that higher rate to fluctuate from month to month and to authorize the assessment of compound interest (*i.e.,* interest on interest). The district court concluded the regulation was *ultra vires* insofar as it established the higher rate, and set aside the regulation and the payment order. We disagree and hold that the general rulemaking provisions found in MMS' organic statutes countenance assessing the higher rate so long as that rate satisfies the criteria imposed by those general rulemaking provisions; we remand for the district court to make this determination. We agree, however, with the district court's conclusions on the questions of shifting interest rates and compound interest. The Debt Collection Act (DCA) plainly forbids the utilization of shifting interest rates, and its implementing regulations (the Federal Claims Collection Standards), while perhaps not as unambiguous on the matter of compound interest, are most sensibly interpreted to preclude that practice as well.

## I.

### A.

Under the Mineral Lands Leasing Act of 1920 (MLLA) and other statutes, MMS

(a subdivision of the Department of the Interior) leases federal and Indian lands containing coal, oil, and other resources to private entities for exploration and extraction.[1] In exchange, lessees of federal land remit royalties and other rental payments to the government, of which 50% is disbursed to the state in which the land is located (90% in the case of Alaska). 30 U.S.C. § 191 (1994). Lessees of Indian land remit similar payments to the government, acting as trustee for the Indians; the entirety is then conveyed to the Indians. Gov't Br. 11 n.7. The size of the royalty payments is determined by statutory formulae. On coal leases, for example, lessees must pay "a royalty in such amount as the Secretary shall determine of not less than 12½ per centum of the value of coal as defined by regulation, except the Secretary may determine a lesser amount in the case of coal recovered by underground mining operations." 30 U.S.C. § 207(a) (1994).

The agency's determination of that amount not surprisingly gives rise to disputes from time to time (mainly appeals to higher levels of the agency) between MMS and the lessee. If the dispute is resolved favorably to MMS after the due date, and if the lessee has timely remitted only a payment based on its own estimate of the coal's value, the lessee will be late on part of its royalty payment obligation—to fully compensate MMS and the states or Indians, the lessee would have to remit the late portion plus interest on that amount. On the other hand, if the lessee were to pay the full amount demanded by the agency prior to appeal and subsequently win the appeal (hence making an overpayment), the lessee would receive a refund only of the excess portion, not interest on that amount. That is because Congress has not expressly provided by statute or contract for recovery of interest against the

---

1. *See* MLLA, 30 U.S.C. §§ 181 *et seq.* (1994); Mineral Leasing Act for Acquired Lands, 30 U.S.C. §§ 351 *et seq.* (1994); 25 U.S.C. §§ 396, 396a–396g (1994) (Indian allotted and tribal lands).

government, and in the absence of such a waiver of sovereign immunity, interest cannot be awarded against the United States. *See Library of Congress v. Shaw,* 478 U.S. 310, 314–17, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). Recognizing this asymmetry, lessees involved in a good-faith royalty dispute typically will timely pay only their lower estimate of the royalty payment.

To address the typical underpayment situation, MMS in 1980 adopted regulations assessing interest on underpayments on leases of resource-containing lands at the current value of funds (CVF) rate. *See* 45 Fed.Reg. 84,762, 84,764 (1980) (interim regulations); 47 Fed.Reg. 22,524, 22,527 (1982) (final regulations). The CVF rate is a rate prescribed by the Treasury Department, by reference to prevailing market rates, for short-term investments of the federal government's operating cash. *See* 31 U.S.C. § 323 (1994). Consequently, an award based on the CVF rate compensates the government for its lost opportunity to make short-term investments due to the late payment of a debt.

In 1983, Congress imposed a higher rate by statute—but only for oil and gas leases, not geothermal or solid mineral leases (such as coal leases). *See* Federal Oil and Gas Royalty Management Act (FOGRMA), Pub.L. No. 97–451, Title I, § 111(a), 96 Stat. 2447, 2455 (1983) (codified at 30 U.S.C. § 1721(a) (1994)). (Congress explicitly deferred legislation on coal leases until MMS studied the matter and filed a report, *see id.* at § 303, 96 Stat. at 2461 (codified at 30 U.S.C.A. § 1752 note (1986)).) The rate chosen for oil and gas leases was the so-called "IRS rate" already in use for underpayment of taxes pursuant to 26 U.S.C. § 6621(a)(2) (1994): the marketable rate for treasury bonds of less than three years maturity, to be deter-

mined monthly, plus three percentage points. Roughly speaking, this rate tends to be 3% higher than the CVF rate. The agency adopted a new implementing regulation for oil and gas leases assessing interest at the IRS rate, *see* 49 Fed.Reg. 37,336, 37,346–47 (1984) (codified at 30 C.F.R. §§ 218.54, 218.55 (1999)), while continuing to assess interest on coal lease underpayments at the CVF rate.

By 1993, the agency came to view the CVF rate as an inadequate response to the underpayment problem on coal leases. Not only did the agency see that rate as insufficient to compensate it and the states or Indians for lost investment income on the late portion of the royalty payments on the leases, it believed the CVF rate actually caused underpayment in the first place because the lessee had an incentive to withhold payment, invest the amount withheld, and remit payment to MMS at a later date, pocketing the spread between the lessee's investment rate of return and the CVF rate. A higher rate was thought necessary, and following the model of its regulation on oil and gas leases, the agency settled on the IRS rate, which would "serve as an effective deterrent to discourage late and underpayments" and "fairly compensate the Federal Government ... States, Indian tribes and allottees, and other recipients ... for the lost time value of money." 59 Fed.Reg. 14,557, 14,557 (1994) (codified at 30 C.F.R. § 218.202(c)-(d) (1999)). As authority, the agency invoked the general rulemaking provisions found in the several organic statutes it administers, particularly MLLA § 32, which provides that "[t]he Secretary of the Interior is authorized to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this chapter." 30 U.S.C. § 189 (1994).[2]

---

**2.** *See also* 30 U.S.C. § 359 (1994) ("The Secretary of the Interior is authorized to prescribe such rules and regulations as are necessary and appropriate to carry out the purposes of this chapter, which rules and

regulations shall be the same as those prescribed under the mineral leasing laws to the extent that they are applicable."); 25 U.S.C. § 396 (1994) ("[T]he Secretary of the Interior is authorized to perform any and all

## B.

Amax Land Company is the successor-in-interest to a 1965 lease of certain federal coal-containing lands in Wyoming. Amax's troubles began in 1985 when the agency invoked its right under the lease to readjust the royalty rate from one based on the weight of the coal produced (17½ cents per ton) to one based on the value of the coal produced (12½% of the value of the coal produced by strip or auger methods and 8% of the value of coal produced by underground methods).[3] The switch from weight to value as the metric for computing royalty payments created uncertainty for Amax, which had begun to utilize coal drying processes to increase the BTU content (and hence the value) of the coal it mined. Amax explained its methodology for determining value to MMS in a 1989 letter and submitted payments accordingly. But in 1994, the agency informed Amax that the coal had been revalued and that additional royalties would be assessed retroactively for the period between January 1989 and July 1993. On September 23, 1994, Amax paid the principal underpayment amount of $35,706.38. Then, in a payment order, MMS assessed Amax $9,044.78 in interest on this principal, calculated as follows: Between March 1989 and April 1, 1994, MMS employed the CVF rate (which fluctuated from month to month), in accordance with the regulation in force at the time, computed as simple interest. Between April 1, 1994—the effective date of MMS' regulation adopting the IRS rate for coal leases—and the payment of the principal on September 23, 1994, the agency charged interest at the

IRS rate (which again fluctuated from month to month), compounded daily.

After an unsuccessful administrative appeal, Amax filed suit in the district court, seeking invalidation of the 1994 regulation and the payment order. *See Amax Land Co. v. Quarterman*, Civ. Act. No. 96–1839, 1998 WL 306582 (D.D.C. June 3, 1998). Amax contended that MMS lacked authority to assess the IRS rate of interest, to allow the rate to shift from month to month, and to charge compound interest. The district court agreed. The court first held that the regulation was *ultra vires* insofar as it adopted the IRS rate, reasoning that Congress' 1982 legislation imposing the IRS rate only on oil and gas lease underpayments, while deferring legislation on coal leases until MMS had studied the matter and proposed or requested new legislation (which never occurred), implies that Congress understood MMS to possess authority merely to assess the CVF rate on coal lease underpayments. The court concluded that although neither the MLLA nor FOGRMA expressly speaks to the issue of interest on late coal lease payments, the agency's reading of MLLA § 32 was unreasonable under step II of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Amax Land Co.* 1998 WL 306582, at *6. The district court next turned to the question of MMS' authority to employ shifting rates and to assess compound interest, which the court thought answered by the Standards (regulations establishing uniform cash management practices for all federal agencies) promulgated under the

---

acts and make such rules and regulations as may be necessary for the purpose of carrying the provisions of this section into full force and effect[.]") (leases of allotted Indian lands); 25 U.S.C. § 396d (1994) ("All operations under any oil, gas, or other mineral lease issued pursuant to the terms of sections 396a to 396g of this title or any other Act affecting restricted Indian lands shall be subject to the rules and regulations promulgated by the Secretary of the Interior.") (leases of unallotted Indian lands).

3. The agency's modification of the lease was in response to the Federal Coal Leasing Amendments Act, Pub.L. No. 97–377, § 6(a), 90 Stat. 1083, 1087 (1976) (codified at 30 U.S.C. § 207(a)), which amended the MLLA to provide that "[a] lease shall require payment of a royalty in such amount as the Secretary shall determine of not less that 12½ per centum of the value of the coal as defined by regulation, except the Secretary may determine a lesser amount in the case of coal recovered by underground operations."

Debt Collection Act of 1982 (DCA), Pub.L. No. 97–365, 96 Stat. 1749 (codified as amended at 31 U.S.C. §§ 3701 *et seq.* (1994 & Supp. II 1996)), which provide that "[t]he rate of interest, as initially assessed, shall remain fixed for the duration of the indebtedness" and that "[i]nterest should not be assessed on interest," 4 C.F.R. § 102.13 (c) (1999). *See id.* at \*6–7. Accordingly, the district court granted summary judgment in favor of Amax, invalidating the regulation and the payment order.

## II.

The agency urges us to defer under *Chevron* to its interpretation of the general rulemaking provisions of its organic statutes as providing ample authority to assess the IRS rate, to allow that rate to shift over time, and to assess compound interest. Amax responds that Congress' 1982 enactment concerning oil and gas leases, the common law of interest, or both, indicate Congress' unambiguous intent to limit the agency to a compensatory rate (which Amax assumes to be the CVF rate). Moreover, it is argued that the agency has departed from its earlier interpretation of its organic statutes without sufficient explanation, and—even apart from the alleged switch—that the agency's current approach is arbitrary and capricious. And Amax submits that the questions of shifting rates and compound interest are readily resolved, as the district court concluded, by reference to the Debt Collection Act and the implementing Standards.

■ We think Amax's common law argument–that the federal common law permits the government to recover no more than a compensatory rate (Amax argues the IRS rate is a punitive rate), and hence

constrains the agency's otherwise broad authority under its organic statutes—can be disposed of handily. Assuming the common law imposes a restraint on an agency's statutory interpretation in a post-*Chevron* era, *see Michigan Citizens for an Indep. Press v. Thornburgh,* 868 F.2d 1285, 1292–93 (D.C.Cir.) . (distinguishing canons that embody a policy choice and should not be employed by a reviewing court at *Chevron* step I or II from canons designed to discern Congress' intent that are appropriately used at *Chevron* step I), *aff'd by an equally divided Court,* 493 U.S. 38, 110 S.Ct. 398, 107 L.Ed.2d 277 (1989), and assuming the common law rule is as Amax describes it (the government characterizes the common law rule as applying only to a federal court's equitable powers, not to interest demands grounded in an administrative regulation), it is an anachronism to speak of the federal common law of interest since Congress' enactment of the DCA in 1982. That statute "changed the common law" by making mandatory the federal government's common law right to assess interest on private persons' overdue obligations to the government. *United States v. Texas,* 507 U.S. 529, 534 n. 4, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993). It also "speak[s] directly," *United States v. Bestfoods,* 524 U.S. 51, 118 S.Ct. 1876, 1885, 141 L.Ed.2d 43 (1998) (quoting *Texas,* 507 U.S. at 534, 113 S.Ct. 1631), to the question of setting an interest rate, thereby supplanting any guidance the common law may have provided on this point: "The head of an executive, judicial, or legislative agency shall charge a *minimum* annual rate of interest on an outstanding debt on a United States Government claim owed by a person that is equal to [the CVF rate]." 31 U.S.C. § 3717(a)(1) (Supp. II 1996) (emphasis added).[4] Thus,

---

4. When *Texas* was decided, the DCA provided that the term "'person' does not include an agency of the United States Government, of a State government, or of a unit of general local government." 31 U.S.C. § 3701(c) (1994). The Supreme Court held that Congress' explicit limitation of the DCA in this manner did

not indicate that Congress had directly spoken to the common law rule allowing the federal government to recover compensatory interest from a local government as debtor, *see, e.g., Board of Comm'rs of Jackson County v. United States,* 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313 (1939), and hence that this as-

the DCA plainly provides authority for an agency to decide what rate is compensatory or even to impose a greater-than-compensatory rate.

 To be sure, MMS did not rely on the DCA when it published the regulation challenged here (perhaps because that could have negative consequences with respect to the agency's claimed *exemption* from the DCA regarding the compound interest and shifting rate issues, which we discuss below), and its response before us to Amax's common law argument likewise does not rely on the DCA. But the government does claim that the common law does not apply to it, and our reading of *Texas* and the DCA—which of course have been cited to us in other respects—convinces us that these authorities obviously support the government's claim. Whether or not a federal court should exercise its discretion to entertain a logically antecedent legal claim not made by a party, *see United States Nat'l Bank v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993), a court may certainly consider any legal authority that bears on an argument that *is* made, *see Independent Ins. Agents of Am., Inc. v. Clarke*, 955 F.2d 731, 743 (D.C.Cir.1992) (Silberman, J., dissenting) (discussing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991)), *rev'd on 'other grounds*, 508 U.S. 439, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993), especially when such legal authority has already been brought to the court's attention, *cf. Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983).

 The FOGRMA statute, on which the district court relied, presents more difficult questions. Obviously if FOGRMA, properly construed, revealed a congressional intent that the agency not be authorized to charge the IRS rate it could not be thought "necessary and proper" under MLLA § 32 to do so. The govern-ment properly objects to the district court's conclusion that "FOGRMA ... makes it clear that Congress itself did not *believe* that the MLLA ever provided sufficient authority for the department to charge the IRS rate.". (emphasis added). That assertion runs afoul of the principle that a later Congress' interpretation of what an earlier Congress intended carries no particular weight—when used for that purpose alone. A later Congress' views can be relevant, however, in interpreting the meaning of its own duly enacted legislation. *See generally United States ex rel. Long v. SCS Bus. & Tech. Inst., Inc.*, 173 F.3d 870, 881 n. 15 (D.C.Cir.1999) (collecting cases). And this seems to be the nature of Amax's argument, *i.e.*, that the FOGRMA Congress' understanding of the agency's interest authority under the MLLA illuminates what *the FOGRMA Congress* intended in restricting FOGRMA to oil and gas leases and deferring legislation on coal leases until the agency's completion of a report. If we agreed with Amax's interpretation of FOGRMA, that statute itself—wholly apart from the MLLA—would limit the agency's interest authority on coal leases.

We start with FOGRMA's text. Section 111(a) provides that "[i]n the case of oil and gas leases where royalty payments are not received by the Secretary on the date that such payments are due, or are less than the amount due, the Secretary *shall* charge interest on such late payments or underpayments at the [IRS rate]." 30 U.S.C. § 1721(a) (1994 & Supp. II 1996) (emphasis added). Here, and indeed throughout FOGRMA, Congress spoke only to oil and gas leases, notwithstanding that the original Senate bill would have extended to leases of all mineral resources. *See* S. REP. No. 97–512, at 11 (1982) (noting that Senate bill had been amended in committee to cover only oil and gas leases). Reading § 111 together with Congress'

---

pect of the common law did survive the DCA. *See Texas,* 507 U.S. at 535, 113 S.Ct. 1631. The DCA has since been amended to include states and local governments. *See* Pub.L. No. 104–134, § 31001(d)(1), 110 Stat. 1321, 1321–359 (1996).

stated purpose to *"expand ... the authorities and responsibilities of the Secretary of the Interior to implement and maintain a royalty management system for oil and gas leases on Federal lands,"* 30 U.S.C. § 1701(b)(2) (emphasis added), Amax infers that Congress demonstrated that legislation was necessary *to authorize* the agency to impose the IRS rate on oil and gas lease underpayments, and that Congress' omission of such legislation for coal leases evinces its intent to prohibit the agency from assessing the IRS rate in that context.

Amax also directs us to the one provision of FOGRMA where Congress did address coal leases. That section provides:

> The Secretary shall study the question of the adequacy of royalty management for coal, uranium and other energy and nonenergy minerals on Federal and Indian lands. The study shall include proposed legislation if the Secretary determines that such legislation is necessary to ensure prompt and proper collection of revenues owed to the United States, the States and Indian tribes or Indian allottees from the sale, lease or other disposal of such minerals.

§ 303(a), 96 Stat. at 2461 (codified at 30 U.S.C.A. § 1752 note (1986)). In Amax's view, this section expresses Congress' understanding (and therefore its intent) that MMS lacks the authority independently to adopt royalty management measures (including charging interest at the IRS rate) similar to those imposed by FOGRMA on the agency for oil and gas leases. Such authority on coal leases, we are told, could only come from Congress, and presumably only after the requested report on coal royalty management had been submitted pursuant to § 303. (The agency's 1984 report concluded that no such legislation was necessary. *See* U.S. DEPARTMENT OF THE INTERIOR, REPORT TO THE CONGRESS OF THE UNITED STATES ON THE ADEQUACY OF ROYALTY MANAGEMENT FOR SOLID MINERALS 18 (1984).)

Amax bolsters its textual arguments with an excerpt of legislative history. The House Report, in describing the pre-FOGRMA state of affairs, explained that "[t]he Federal royalty management system lacks adequate enforcement tools. Under the present system, the MMS has very limited authority to impose penalties (beyond ordinary interest charges) even for gross, repeated underpayments of royalties." H. R. REP. No. 97–859, at 18 (1982), *reprinted in* 1982 U.S.C.C.A.N. 4268, 4272. Equating "ordinary interest charges" with the compensatory CVF rate, appellee views this excerpt as quite supportive of its interpretation.

The government, for its part, observes that § 111(a) is phrased as a mandatory command—"the Secretary *shall* charge interest [at the IRS rate]," 30 U.S.C. § 1721(a) (emphasis added)—rather than as a grant of authority. Thus, Congress may have intended to *require* the IRS rate for oil and gas leases, while leaving to the agency's discretion which rate to impose for coal leases. The government responds similarly to appellee's reliance on the study-and-report provision in § 303, reading that section to mean that if the agency wanted *mandatory* royalty management measures imposed on it *by Congress* (including the IRS rate), it could submit such a request in the report. Accordingly, the study-and-report command does not imply anything regarding the agency's authority to impose such measures on itself by regulation.[5] And whereas appellant focuses on Congress' stated purpose to "expand" the agency's authority regarding royalty management for oil and gas leases, *see* 30 U.S.C. § 1701(b)(2) ("It is the purpose of this chapter to clarify, reaffirm, expand, and define the authorities and responsibili-

---

5. The agency appeared to assume this interpretation of § 303 in the 1984 report submitted to Congress. *See* U.S. DEPARTMENT OF THE INTERIOR, *supra,* at 18 ("[A]ny additional au- thorities determined to be necessary can and will be developed through modification of internal procedures, new lease terms, or by rulemaking.").

ties of the Secretary of the Interior to implement and maintain a royalty management system for oil and gas leases on Federal lands....”), the government highlights the words “clarify” and “reaffirm,” and submits that in the context of a statute addressing so many aspects of oil and gas lease royalty management, it is far from clear that Congress meant to link the word “expand” in this general statement of purposes to the one specific provision mandating assessment of the IRS rate. Finally, the government points to FOGRMA § 304, which provides that “[t]he penalties and authorities provided in this chapter are supplemental to, and not in derogation of, any penalties or authorities contained in any other provision of law,” 30 U.S.C. § 1753(a) (1994). While there may be disagreement as to the scope of those “authorities contained in any other provision of law,” the government urges that this section must at least mean that Congress intended FOGRMA to have no effect on them.

Amax’s § 111(a) argument, by itself, would be based on a use of the *expressio unius est exclusio alterius* canon in a context, where, as we have indicated before, it is rather tenuous. *See Cheney R.R. Co. v. ICC,* 902 F.2d 66, 69 (D.C.Cir.1990) (“[T]he contrast between Congress’s mandate in one context with its silence in another suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, *i.e.,* to leave the question to agency discretion.”) (emphasis in original); *see also Shook v. District of Columbia Fin. Responsibility & Management Assistance Auth.,* 132 F.3d 775, 782 (D.C.Cir.1998). But the explicit mention of coal leases—the “*alterius*”—in the study-

and-report command makes the negative implication somewhat stronger. And we agree that the legislative history is at least supportive. Still, we cannot say that Congress directly addressed the issue before us as the first step of *Chevron* requires. So we must defer to the agency’s interpretation, if reasonable. We think that, particularly in light of § 304, the agency’s interpretation passes that test, and therefore we disagree with the district court’s conclusion.

### III.

Amax alternatively argues that MMS’ present view of its rulemaking authority contradicts an earlier position taken by Interior’s Board of Land Appeals (a body that reviews the MMS Director’s adjudicatory decisions) in *Shell Offshore, Inc.,* 115 I.B.L.A. 205 (1990). This contention, if true, would not of itself defeat *Chevron* deference, *see Paralyzed Veterans of Am. v. D.C. Arena L.P.,* 117 F.3d 579, 586 (D.C.Cir.1997) (citing *Chevron,* 467 U.S. at 863, 104 S.Ct. 2778), *cert. denied sub nom. Pollin v. Paralyzed Veterans of Am.,* —— U.S. ——, 118 S.Ct. 1184, 140 L.Ed.2d 315 (1998), but would, under *Motor Vehicle Mfrs. Ass’n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 46–57, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), require the agency to provide a reasoned explanation for the changed interpretation, *see Smiley v. Citibank, N.A.,* 517 U.S. 735, 742, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996); *Arent v. Shalala,* 70 F.3d 610, 616 n. 6 (D.C.Cir.1995) (citing *Rust v. Sullivan,* 500 U.S. 173, 186–87, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)).[6]

---

**6.** We recognize that there is some inconsistent language in the Supreme Court’s cases on the proper level of deference due an agency’s revised interpretation of a statute it administers. *Compare, e.g., INS v. Cardoza-Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (“An agency interpretation of a relevant provision which conflicts with the agency’s earlier interpretation is ‘entitled to considerably less deference’

than a consistently held agency view.” (quoting *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981))), *with Rust,* 500 U.S. at 186–87, 111 S.Ct. 1759 (“This Court has rejected the argument that an agency’s interpretation ‘is not entitled to deference because it represents a sharp break with prior interpretations’ of the statute in question.” (quoting *Chevron,* 467 U.S. at 862, 104 S.Ct. 2778)). *See generally* Comment, Chevron,

But no such change has occurred here. In *Shell Offshore*, the agency's Board of Land Appeals was presented with the question whether MMS could assess interest at the IRS rate on delinquent oil and gas lessees for periods of time prior to Congress' explicit authorization of the IRS rate for oil and gas leases in FOGRMA. The Board of Land Appeals held that the MMS could only assess interest at the CVF rate for such periods:

> Although prior to the passage of 30 U.S.C. § 1721 (1982), MMS was authorized *by equity* to assess interest in order to compensate the Department for the time value of money, the interest rate authorized by 30 U.S.C. § 1721 (1982) is greater than necessary to compensate for the time value of money.... Thus, although MMS was authorized to assess interest prior to passage of FOGRMA, it was not authorized to assess interest at the rate specified by FOGRMA....

*Shell Offshore*, 115 I.B.L.A. at 212 (emphasis added) (citations and footnote omitted). That interpretation of the agency's interest authority may be dubious insofar it is grounded in general notions of "equity." (Agencies, of course, are totally creatures of statute.) But in any event, as the government points out, the Board of Land Appeals in *Shell Offshore* did not consider that MLLA § 32 or the other general rule-making provisions might furnish the authority for the agency to assess the IRS rate. MMS' 1994 rulemaking, which expressly relied on those provisions, *see* 59 Fed.Reg. at 14,557–58, accordingly cannot be deemed a departure.

■ So it is that MLLA § 32 gives the agency the *authority* to reach the subject matter of interest. But not without limits: Section 32, it will be recalled, requires that any regulations adopted by MMS be "necessary and proper ... to carry out and accomplish the purposes of this chapter." 30 U.S.C. § 189. Amax, supported by the National Mining Association as *amicus curiae*, contends that MMS' regulation is arbitrary and capricious, *see* 5 U.S.C. § 706(2)(A) (1994)—which is more or less the same as saying that the agency has ignored the "necessary and proper" command.[7] It is argued, for example, that the degree of underpayment on coal leases pales in comparison to the magnitude of underpayment on oil and gas leases that prompted FOGRMA, so that the IRS rate is not "necessary" to deter late payments; that the CVF rate is adequate to deter late payments because the coal mining industry's return on assets is lower than the CVF rate; that most late payments result from coal lessees losing good-faith admin-

---

*Take Two: Deference to Revised Agency Interpretations of Statutes*, 64 U. Chi. L.Rev. 681 (1997). Although we have cited *Cardoza–Fonseca* approvingly in *dicta*, *see Huls America, Inc. v. Browner*, 83 F.3d 445, 450 n. 6 (D.C.Cir.1996), we more frequently articulate and apply the standard in analogous terms to those chosen by the Supreme Court in its most recent statement (albeit in *dicta*) of the issue in *Smiley*, 517 U.S. at 742, 116 S.Ct. 1730, *see Independent Bankers Ass'n of Am. v. Farm Credit Admin.*, 164 F.3d 661, 668 (D.C.Cir.1999) (citing *Smiley*); *Paralyzed Veterans*, 117 F.3d at 586; *Bush–Quayle '92 Primary Comm., Inc. v. FEC*, 104 F.3d 448, 453–55 (D.C.Cir.1997); *Arent*, 70 F.3d at 616 n. 6, and we do so here.

**7.** Whether MMS' regulation is "necessary and proper" is not so much a *Chevron* statutory interpretation question as an arbitrary and capricious issue. That standard is more fit-

ting here given the breadth of the "necessary and proper" command. *See National Ass'n of Regulatory Util. Comm'rs v. ICC*, 41 F.3d 721,. 727 (D.C.Cir.1994) ("When Congress' instructions are conveyed at a high level of generality, an agency is not likely to consider its action as an 'interpretation' of the authorizing statute, nor is that action likely to be challenged as a 'misinterpretation.' "). Still, we have also recognized a significant overlap between *Chevron* step II and APA arbitrary or capricious review. *See, e.g., Republican Nat'l Comm. v. FEC*, 76 F.3d 400, 407 (D.C.Cir. 1996); *Arent*, 70 F.3d at 616 n. 6; *Regulatory Util. Comm'rs*, 41 F.3d at 728. At bottom, the label put on the reviewing framework is not so important in this case: it is not much different to ask whether MMS' regulation is "necessary and proper" than to ask whether it is "arbitrary [or] capricious."

istrative appeals rather than engaging in strategic investment behavior; and that the agency has failed to consider an important aspect of the late payment problem, *i.e.*, the agency's leisurely processing of administrative appeals (which, it is feared, may get worse once the agency stands to receive a higher interest rate). The agency's response is somewhat anemic. In its rulemaking statement, it dismissed complaints about the length of the administrative appeals process with the brusque assertion that "[t]his issue is beyond the scope of this rulemaking" and a promise to streamline the appeals process. 59 Fed. Reg. at 14,557. And in its brief, the agency ignores most of the contentions advanced by Amax and its *amicus* and simply says that $27 million in lost interest revenue is not so insubstantial a sum as to make the agency's corrective measure unnecessary or improper.

The district court saw no need to reach this issue given its resolution of the antecedent question of the agency's *authority* in favor of Amax. *See Amax Land Co.*, 1998 WL 306582, at *3. That, of course, does not bar us from doing so: these are questions of law, which were presented to the district court, and we sit in the same posture as the district court in reviewing an administrative regulation or adjudication. *See, e.g., Associated Builders & Contractors, Inc. v. Herman*, 166 F.3d 1248, 1254 (D.C.Cir.1999); *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1225 (D.C.Cir.1993). Still, since the issue has not been fully briefed, and since both Amax (paradoxically) and MMS request us to remand to the district court for consideration of this issue, we will do so, notwithstanding the *amicus'* preference that we resolve it here and now. *Cf. Narragansett Indian Tribe v. National Indian Gaming Comm'n*, 158 F.3d 1335, 1338 (D.C.Cir.1998) (declining to consider an argument advanced by an *amicus* but not by any party).

8. MMS also advanced its interpretation of the regulation as authorizing compound interest in the regulation's preamble. *See* 59 Fed.Reg.

**IV.**

▮ Whether the benchmark rate is the CVF rate or the IRS rate, there remains the issue of MMS' authority to allow the rate to shift over time and to assess compound interest (*i.e.*, interest on interest). The regulation itself is silent on these matters, but the agency interpreted it in the payment order issued to Amax as authorizing the assessment of compound interest (compounded daily), apparently reasoning that the regulation adopts the IRS rate set forth in 26 U.S.C. § 6621(a)(2), which contemplates shifting interest rates, *see id.* § 6621(b), and that an adjacent provision in the Internal Revenue Code provides that the rate shall be compounded daily, *see id.* § 6622(a).[8]

▮ Amax does not claim these are misinterpretations of the agency's own regulation, 30 C.F.R. § 218.202, but rather submits that the DCA and the implementing Standards place an external constraint on the agency's authority to assess compound interest or to employ shifting rates. The DCA provides, in relevant part,

**§ 3717. Interest and penalty on claims**

(a)(1) The head of an executive, judicial, or legislative agency shall charge a minimum annual rate of interest on an outstanding debt on a United States government claim owed by a person that is equal to the average investment rate for the Treasury tax and loan accounts for the 12–month period ending on September 30 of each year, rounded to the nearest whole percentage point . . .

. . .

(c) The rate of interest charged under subsection (a) of this section—

. . .

(2) remains *fixed* at [the rate in effect on the date from which interest begins

at 14,558 ("The IRS rate is compounded daily, as contrasted to the CVF rate which is calculated as simple interest.").

to accrue] *for the duration of the indebtedness.*

31 U.S.C. § 3717 (emphasis added). MMS defends its authority to employ shifting rates by contending that § 3717(c)(2)'s apparently plain prohibition of shifting rates applies only when an agency chooses to impose the "minimum" CVF rate and not when an agency exerts its authority, drawn from these provisions or others, to assess a higher rate. Even aside from the fact that we owe no deference to MMS' interpretation of a statute it does not administer, *see, e.g., Scheduled Airlines Traffic Offices v. Department of Defense,* 87 F.3d 1356, 1361 (D.C.Cir.1996); *OPM v. FLRA,* 864 F.2d 165, 171 (D.C.Cir.1988); the DCA is unambiguous on this issue. 31 U.S.C. § 3717(a)(1) requires agencies to assess interest on overdue obligations and sets a *floor* on the rate chosen at the CVF rate. The ceiling is established by 5 U.S.C. § 706(2)(A): the agency may not choose an arbitrary or capricious rate. *See also* 4 C.F.R. § 102.13(c) ("An agency may set a higher rate if it reasonably determines that a higher rate is necessary to protect the United States."). *Any rate* within this spectrum is "the rate of interest charged under subsection (a)" for purposes of 31 U.S.C. § 3717(c), and hence must remain "fixed . . . for the duration of the indebtedness." We therefore firmly reject the government's argument.

■ As to compound interest, the DCA is silent but Amax invokes the Standards, which expressly disfavor the practice of charging compound interest.

> The rate of interest shall be the [CVF rate]. An agency may assess a higher rate of interest if it reasonably determines that a higher rate is necessary to protect the interests of the United States. The rate of interest, as initially assessed, shall remain fixed for the duration of the indebtedness, except that where a debtor has defaulted on a repayment agreement and seeks to enter into a new agreement, the agency may

set a new interest rate which reflects the current value of funds to the Treasury at the time the new agreement is executed. *Interest should not be assessed on interest, penalties, or administrative costs required by this section.*

4 C.F.R. § 102.13(c) (emphasis added). The government's response echos its unsuccessful attempt to evade the DCA's prohibition on shifting rates. We are told that the "interest should not be assessed on interest" command applies only in the case of "interest . . . required by this section," that the only interest *required* by § 102.13 is the CVF rate, and hence that the rule against compound interest does not apply when the agency imposes a rate higher than the CVF rate. We think that is a rather implausible reading of the regulation. How could the CVF rate be the only "required" rate when the second sentence contemplates a higher rate? The "interest . . . required by this section" sensibly means either the CVF rate (as described in the first sentence) or a higher rate (as described in the second sentence). It may be that the government's reading, while weak, is nonetheless reasonable. But even assuming it is reasonable (we express no view), we owe no deference to MMS' interpretation of a regulation that it did not promulgate and does not administer, *Martin v. OSHRC,* 499 U.S. 144, 152–53, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991). Left to proceed *de novo,* we of course pick what we think is the best interpretation of the regulation.

■ The government, however, points to an introductory provision of the Standards that says: "The standards set forth in this chapter shall apply to the administrative handling of civil claims of the Federal Government for money or property but *the failure of an agency to comply with any provision of this chapter shall not be available as a defense to any debtor.*" 4 C.F.R. § 101.8 (emphasis added). Unfortunately, this claim comes too late.[9]

---

9. Our treatment of this claim as waived differs from our earlier willingness to consider

The government concedes that it did not present this contention to the district court, and it cannot be heard to do so now. *See Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). Whether it can timely assert this "defense" on remand, *see R.G. Johnson Co. v. Apfel,* 172 F.3d 890, 895 (D.C.Cir.1999) (citing *Peralta v. U.S. Attorney's Office,* 136 F.3d 169, 173 (D.C.Cir.1998)), and, if so, the proper outcome on the merits, are matters we leave to the district court to decide in the first instance.[10]

* * * *

■ That disposes of Amax's challenge to the regulation itself, but there is one last wrinkle concerning Amax's challenge to the *payment order.* Although we hold that the DCA and the Standards forbid the use of shifting interest rates or the assessment of compound interest, the DCA comes with two exemptions. The one invoked by the agency provides that 31 U.S.C. § 3717 does not apply "to a claim under a contract executed before October 25, 1982, that is in effect on October 25, 1982." 31 U.S.C. § 3717(g)(2); *see also* 4 C.F.R. § 102.13(i)(1)(ii) (identical exemption from operative subsections of 4 C.F.R. § 102.13). The parties disagree as to whether Amax's lease agreement is such a pre–1982 contract.

Amax is the successor-in-interest to a 1965 lease. Section 2(c) of the original lease required the lessee to remit royalties based on the weight of the coal produced (17½ cents per ton for the first 10 years and 20 cents per ton for the remainder of the first 20–year period), and § 3(d) re-

served to MMS the right "reasonably to readjust and fix royalties payable hereunder and other terms and conditions at the end of 20 years from the date hereof and thereafter at the end of each succeeding 20–year period during the continuance of this lease. . . ." In 1985, the agency, invoking § 3(d), readjusted the lease terms to provide that "the royalty shall be 12½ percent of the value of the coal produced by strip or auger methods and 8 percent of the value of the coal produced by underground mining methods."

■ Amax insists that the 1985 readjustment of the royalty rate effected a novation of the 1965 lease agreement and a consummation of a new agreement going forward. The government responds that the 1985 readjustment was explicitly contemplated by the original 1965 lease, and therefore is properly characterized as an assertion of rights under the original contract, not a novation. Since Amax, as the party challenging the payment order, has not cited any authority in support of its view, we are inclined to agree with the government's characterization, *see Carducci,* 714 F.2d at 177, which seems the more reasonable one in any event. Accordingly, we hold that the DCA imposes no constraint on MMS vis-a-vis underpayments on this particular lease, and unless it is determined on remand that shifting rates or compound interest are not "necessary" within the meaning of MLLA § 32 *as regards this particular lease,* the payment order is valid. *See* 30 U.S.C. § 189 ("The Secretary of the Interior is authorized . . . to do any and all things necessary to carry

the impact of the DCA on the common law notwithstanding the government's failure to make the argument. There is a good reason. Unlike the DCA, which provided an additional argument supporting the government's already asserted *claim* that the common law does not apply to it, the government's citation of 4 C.F.R. § 101.8 here is surely a new claim, akin to a statute of limitations defense.

**10.** It may be that 4 C.F.R. § 101.8, while preventing a debtor from invoking the Stan-

dards as a "defense" to the government agency's "administrative handling of civil claims," does not preclude a challenge—wholly aside from a dispute over a particular debt—to the legality of an agency's regulation. Here Amax challenges *both* MMS' payment order *and* MMS' regulation, 30 C.F.R. § 218.202. *See* Complaint for Declaratory and Set Aside Relief ¶ 1, Civ. Act. No. 96–839 (D.D.C. Aug. 6, 1996).

out and accomplish the purposes of this chapter.").

\* \* \* \*

For the foregoing reasons, we reverse the district court and uphold MMS' regulation, 30 C.F.R. § 218.202, except insofar as the agency has interpreted it to allow for shifting interest rates and compound interest. We remand the case for the district court to consider Amax's claim that the regulation, insofar as it adopts the IRS rate, is not "necessary and proper" within the meaning of MLLA § 32. And we uphold the payment order in all respects, subject to the possibility that Amax may demonstrate on remand that compound interest and shifting rates are not "necessary" within the meaning of MLLA § 32 as regards Amax's particular lease.

*So ordered.*